Bishop Nathaniel L. LINSEY, individually and as trustee for the First C.M.E. Church of Anchorage, Alaska, Plaintiff,

v.

E.F. HUTTON & COMPANY, INC., et al., Defendants.

Civ. A. No. 86–3555.

United States District Court, District of Columbia.

Nov. 23, 1987.

Arthur M. Reynolds, Reynolds & Mundy, Washington, D.C., for plaintiff.

Charles R. Mills, Mahlon M. Frankhauser, David S. Frye, Barrett, Smith, Schapiro, Simon & Armstrong, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Nathaniel L. Linsey, a bishop of the Christian Methodist Episcopal (C.M.E.) Church, is suing E.F. Hutton & Company, Inc., and one of its brokers, Joseph D. Alexander, as a result of losses from the investment of church funds. By order dated July 27, 1987, the Court severed the claims against defendant Alexander and stayed those proceedings until the resolution of his bankruptcy. This matter is now before the Court on defendant E.F. Hutton & Co.'s motions to dismiss and for summary judgment. Because Bishop Linsey lacks standing either as a representative of the church or individually under federal securities laws, and because he did not suffer a legally cognizable personal injury, the Court shall enter summary judgment for defendant and dismiss the complaint with prejudice.

### Background

Plaintiff has been a bishop of the C.M.E. Church since 1978. In October, 1982, he became Bishop of the Ninth Episcopal District, which includes California and Alaska. In July, 1986, after the events complained of herein, he became bishop of the Tenth Episcopal District, which includes Africa and is headquartered in Lagos, Nigeria.

In early 1984, land and a church building that had been used by the First C.M.E. Church of Anchorage, Alaska, were sold for $1,400,000. The check, payable to the California Conference of the C.M.E. Church, was deposited in an account in the name of the California Conference with the Founders Savings and Loan Association in Los Angeles. The signatories on the account were Bishop Linsey and Mrs. Esther Parks, treasurer of the California Conference. Plans called for securing a new church or church site in Anchorage in about a year and investing the money in the meantime.

In April, 1984, plaintiff and defendant Alexander discussed opportunities for investing the $1,400,000. On April 24, 1984, plaintiff as president of the California Conference and Mrs. Parks as treasurer established an account with E.F. Hutton & Co.'s branch office in Washington, D.C., where defendant Alexander was employed. The account documents identified the customer as the C.M.E. Church California Conference; they were executed by plaintiff as president of the California Conference and Mrs. Parks as treasurer. Checks could be written on the account only if signed by both plaintiff and Mrs. Parks.

In early May, 1984, a parsonage was purchased in Anchorage with a portion of the funds; the remainder of the money, $1,194,000, was wired to E.F. Hutton & Co. in Washington on May 3, 1984. Stocks, bonds, and treasury bills were purchased. Plaintiff received monthly statements and confirmations of transactions in the account, and repeatedly expressed concerns about the account's performance. As a result, an options account agreement was executed by plaintiff and Mrs. Parks in late July, 1984. Plaintiff continued to be unhappy with the return, and on December 6, 1984, after receiving an accountant's analysis that the account was indeed losing money, ordered all securities liquidated and the money placed in a money market account. A series of withdrawals followed; by December 4, 1985, the account was essentially emptied.

There is disagreement on precisely how much money was lost. A church report apparently places the loss at $300 over the 19-month life of the account; the account lost $72,236 on the sale of stock, but reported $71,936 income in interest and dividends. The complaint claims $52,000 in principal was lost and the church was denied about $125,000 interest that would have been earned had the funds remained on deposit at Founders Savings and Loan Association.

Plaintiff alleges that as a result of the poor investment performance of the funds entrusted him he was in July, 1986, "demoted and reassigned to the least desirable Episcopal District in the C.M.E. Church, The Tenth Episcopal District, in Africa." In addition to the less desirable assignment, plaintiff did not as bishop of the Tenth Episcopal District receive an official residence or housing allowance; he estimated his additional out-of-pocket expenses resulting from the four-year assignment to the Tenth Episcopal District to be $160,000.

Plaintiff filed this complaint on December 31, 1986, alleging that false representations had been made that the return on funds invested with E.F. Hutton & Co. would be not less than 15 percent and there would be no loss of principal. He also alleged that the defendants failed to warn of the risks associated with options trading. The complaint states five counts: violation of section 10(b) of the Securities and Exchange Act of 1934; "negligence per se and presumed," apparently stating a theory of common law negligence based on violation of the Securities and Exchange Act; common law negligence; common law fraud; and breach of fiduciary duty. All of the counts simultaneously seek damages for plaintiff in his representative capacity and in his personal capacity.

### Bishop Linsey's Standing as a Representative of the Church

Plaintiff states in his complaint that he is suing both individually and "as agent and trustee for the Christian Methodist Episcopal Church." Defendant E.F. Hutton & Co. challenges his standing to sue on be-

half of the Christian Methodist Episcopal Church or the First C.M.E. Church of Anchorage, Alaska.

▮ Defendant has submitted a resolution adopted by the College of Bishops of the C.M.E. Church on October 2, 1987, expressly disavowing Bishop Linsey's authority to sue as a representative of the Church. The resolution, whose authenticity has not been challenged by the plaintiff, states in part:

1. That the College of Bishops instruct the General Counsel of the Christian Methodist Episcopal Church to take whatever legal action he deems necessary to disjoin the Christian Methodist Episcopal Church from the Nathaniel L. Linsey vs E.F. Hutton litigation.

. . . . .

3. That the General Counsel be authorized to take whatever legal steps required to establish Bishop E. Lynn Brown, Presiding Bishop of the 9th Episcopal District of the Christian Methodist Episcopal Church as the bishop authorized to act on behalf of the Ninth Episcopal District as a whole and the California Annual Conference specifically in the Nathaniel L. Linsey vs E.F. Hutton litigation.

4. That the General Counsel be authorized to take whatever legal steps necessary for Bishop E. Lynn Brown, Presiding Bishop of the Ninth Episcopal District, to negotiate for the First CME Church of Anchorage, Alaska in the Nathaniel L. Linsey vs E.F. Hutton litigation.

This resolution of the College of Bishops can only be read as putting to rest any claim by plaintiff that he is entitled to proceed in this litigation as a representative of the Church under Fed.R.Civ.P. 17. It is not surprising that at oral argument on October 28, 1987, and subsequent pleadings plaintiff's counsel abandoned the argument that Bishop Linsey has standing to represent the Church.[1]

▮ Plaintiff's claim of standing as a "trustee" is unavailing because he has presented no evidence whatever that he is "trustee of an express trust," as Fed.R.Civ. P. 17 requires if the suit is to be maintained without joining the party for whose benefit the action is brought.

### Bishop Linsey's Standing as a Purchaser or Seller of Securities

Plaintiff also argues that he has standing to sue as a "purchaser or seller" of securities under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982). He argues through counsel that the cause of action under section 10(b) belongs not to the Church, which owned the money and suffered any investment losses that occurred, but to him as the "decision maker."

Plaintiff's argument is based upon a misreading of *O'Brien v. Continental Illinois National Bank and Trust Co.*, 593 F.2d 54 (7th Cir.1979). In *O'Brien*, trustees of a pension fund delegated complete investment control to a bank; the trustees had "no right to receive notice of, or to be consulted about, proposed investments and no right to veto investment decisions." *Id.* at 57. In their suit, the pension fund trustees alleged that the bank was a substantial creditor of companies whose securities the

---

1. Fed.R.Civ.P. 17 states in part:

No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Bishop Linsey's standing has been at issue at least since the filing of defendant's motion to dismiss and for summary judgment on September 11, 1987. The College of Bishops adopted its resolution concerning Bishop Linsey's standing as a church representative on October 2, 1987; the record also includes correspondence between Leonard V. Brady, general counsel of the C.M.E. Church, to defendant's attorney (October 20, 1987) and to plaintiff's attorney (dated November 10, 1987).

The Court can only conclude that a "reasonable time" has been allowed for the Church, as real party in interest, or its authorized representative to enter this litigation.

bank purchased for the pension fund. Had this information been disclosed, the trustees would have terminated the relationship with the bank.

The District Court dismissed the trustees' suit under section 10(b), and the Court of Appeals affirmed. The Seventh Circuit held that the trustees had no federal cause of action against the bank for deception because they made no investment decisions.

> Information material to the decision whether to terminate the trust or agency agreements is outside the penumbra of § 10(b) ... because such a termination is not a security transaction. Section 10(b)'s fundamental purpose is to assure that full information is available to decision makers in security transactions. Protection of those who have entrusted the decision making to others is a concern of state law, for which a cause of action under § 10(b) should not be inferred.

*Id.* at 60 (citations omitted).

The essential teaching of *O'Brien* is that the pension fund trustees could not be deceived by the bank under section 10(b) because the deception could go only to the decision whether to retain the bank, not to the decision whether to purchase or sell any security. The court did not hold that the pension fund trustees were incapable of being deceived *by a buyer or seller of securities* under section 10(b).

> Denial of the federal claims asserted here does not mean, as plaintiffs suggest it would, that one who buys securities through a discretionary account or through another agent or trustee is outside the protection of § 10(b) and Rule 10b–5. Our holding does not affect any claim the principal or beneficiary may assert, alone or jointly with the agent or trustee, against the seller of the securities. Such a claim is not before us.

*Id.* at 62.

The Seventh Circuit reiterated its view in *Congregation of the Passion v. Kidder Peabody & Co.*, 800 F.2d 177 (7th Cir.1986). In that case, a Roman Catholic religious community hired an investment manager for its funds, giving him "full discretion to develop and implement a prudent portfolio strategy." *Id.* at 178–79. The court found the Congregation made no investment decisions and consequently had no 10(b) cause of action against its investment manager, Mr. Newell.

> The Congregation did retain the authority to increase or decrease the investment fund and ultimately to dismiss Mr. Newell. However, this authority relates to its relationship with Mr. Newell, not to any particular decision to purchase or sell a security. The federal protection of section 10(b) and Rule 10b–5 does not govern this relationship.

*Id.* at 181.

Thus, the key in both *O'Brien* and *Congregation of the Passion* is that the investor retained no control over investment decisions, but delegated absolute authority to an investment manager. The cases are inapposite here because it is clear from the depositions of plaintiff and defendant Alexander that E.F. Hutton & Co. was not delegated complete authority over the Church's money. Indeed, plaintiff's argument is that E.F. Hutton & Co.'s unlawful practices were deceptive and resulted in investment losses in the purchase and sale of securities.

 Bishop Linsey's claim is simply that the brokerage deceived *him*, as the investment decision maker, not the church. However, he was acting merely as the agent of the Church; decisions he made were made on behalf of the Church. The Church, not Bishop Linsey, was the purchaser and seller of securities. The Church was capable of being deceived, through its agents, and the cause of action under section 10(b) thus belongs to the Church and not to its agent.

This analysis is consistent with *Congregation of the Passion,* where the Seventh Circuit expressed no difficulty with the religious organization's standing except as a result of its total delegation of investment authority. The opinion makes it clear that if the Congregation had retained investment authority it could have sued its investment manager under section 10(b).

Nowhere does the opinion suggest that only the Congregation's agent, in this case its treasurer, Father Parsons, would have had standing under the Securities and Exchange Act.

Accepting plaintiff's argument of "decision maker standing" would mean that no corporation or other fictional person could ever maintain a section 10(b) suit, because such a body is incapable of making a decision except through human agents. This plainly is error and his novel theory of standing must be rejected. *See, e.g., Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 10, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971) (section 10(b) "protects corporations as well as individuals who are sellers of a security"); *Goldberg v. Meridor,* 567 F.2d 209, 215 (2d Cir.1977) (same), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); *Kaplan v. Bennett,* 465 F.Supp. 555, 565 (S.D.N.Y.1979) (same).

### *Bishop Linsey's Claim of Personal Injury*

 Plaintiff cannot prevail on his diversity claim against E.F. Hutton & Co. because the brokerage owed him no duty personally. He acted solely as an agent of the Church, and it is well settled that an "agent has no action of tort because another has tortiously harmed the principal...." *Restatement (Second) of Agency* § 374(2) (1958). "In conformity with the normal tort rule, a servant who loses his job or otherwise suffers economic loss as a result of the principal's misfortune, tortiously caused by another, has not thereby an action against the other." *Id.* comment b. Plaintiff's attempt to derive a common law duty from section 10(b) fails for the same reason that plaintiff lacks standing under section 10(b).

### *Conclusion*

Bishop Linsey has no personal claim against E.F. Hutton and Co. or its broker under federal securities laws or common law tort principles, and he is not an express trustee or authorized representative of the C.M.E. Church capable under Fed.R.Civ.P.

17 of pursuing litigation without joining the Church as the party for whose benefit the action is brought. Accordingly, summary judgment must be entered for defendant pursuant to Fed.R.Civ.P. 56(c). An order consistent with the foregoing accompanies this Memorandum Opinion.

### ORDER

Upon consideration of defendant's motions to dismiss and for summary judgment, plaintiff's opposition, defendant's reply, oral argument, and the entire record herein, and for the reasons set forth in the accompanying Memorandum Opinion, it is this 23rd day of November, 1987

ORDERED that defendant's motion for summary judgment is GRANTED; and it is

FURTHER ORDERED that plaintiff's complaint is DISMISSED with prejudice.