Lea J. UHRE

v.

**EMMETT A. LARKIN COMPANY, INC. et al.**

No. CIV.A. DKC2000–2704.

United States District Court, D. Maryland.

May 28, 2002.

Michael S. Fried, Rockville, MD, for Lea J. Uhre.

Deborah Brand Baum, Shaw Pittman, LLP, Washington, DC, Stuart W. Emmons, William B. Federman, Oklahoma City, OK, for Salomon Grey Financial Corp.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this securities fraud case is Defendants' Motion to Dismiss pursuant to Fed. R.Civ.P. 12(b)(1) or (6). The issues are fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, the motion will be granted in part and denied in part.

## I. Background

The following facts are alleged in the amended complaint. Between 1990 and 1992, Curtis B. Uhre purchased over two million shares of Pierce International, Inc. ("Pierce"). Curtis B. Uhre transferred his ownership of the 2,175,000 shares of Pierce to his wife, Plaintiff Lea J. Uhre, through irrevocable stock powers on June 26, 1994.[1] As a result of a later reverse stock split, the total holding was reduced to 87,000 shares.

On or about September 8, 1999, Donson Brooks, a representative of Solomon Grey, called Curtis B. Uhre offering to sell 500 shares of Nathaniel Energy Corporation ("Nathaniel Energy") at $5.75 per share. Brooks represented that Nathaniel Energy's stock price would soon double or triple, which would cause it to be listed on NASDAQ, thereby causing it to double or triple again. Brooks induced "Plaintiff" to sell 27,000 shares of Pierce stock, by mis-informing "Plaintiff" that the price of the Pierce stock had recently decreased by 50%, that the company was going out of business, and the stock would be worthless in six months. Brooks failed to inform "Plaintiff" that the State of Texas had entered a cease and desist/injunction against him on August 12, 1999 and that he had entered into a Consent Decree providing for additional supervision of his actions and other restrictions at the time of this call. In addition, Brooks did not notify "Plaintiff" that both he and Kyle Rowe had previously worked for Pacific Cortez Securities Inc., which had been censured by the NASD, sanctioned, and barred from selling penny stocks for violating federal securities laws governing penny stock trading. Plaintiff also alleges a number of other misrepresentations by defendants.

Based upon Brooks' representations, Plaintiff agreed to transmit her remaining shares of Pierce International with her irrevocable stock power to Brooks for deposit into her account at Salomon Grey. Plaintiff's agent, Curtis B. Uhre, informed Brooks that all of the Pierce International stock had been transferred to Plaintiff and that Defendant would be acting for her benefit in connection with this stock and the sale thereof. Brooks agreed to transfer the ownership of the account titled Curtis B. Uhre to Plaintiff to reflect the transfer of June 24, 1994 to Plaintiff.

Plaintiff submitted a check for $1595.00 to Salomon Grey to pay for the balance of the purchase of the Nathaniel Energy Stock. Salomon Grey requested that she replace her check with one from her spouse, Curtis B. Uhre. Plaintiff refused and notified Defendants that she was cancelling her purchase of the Nathaniel Energy stock. Defendants then attempted to deposit Plaintiff's check. Defendants failed to provide to Plaintiff both a Risk Disclosure Document regarding low priced stocks and the bid and ask questions regarding the sale of Pierce stock and the purchase of Nathaniel Energy stock. Defendants also failed to disclose the aggregate amount of compensation received by them and associated persons with regard to these transactions.

On November 17, 1999, Brooks contacted Plaintiff and urged her to sell her remaining shares of Pierce International stock, falsely stating that Pierce would be out of business soon and that its stock would be worthless, to induce her to sell so that Defendants would obtain illegal compensation. Plaintiff relied on this representation and sold the remaining 60,000 shares of Pierce International stock. On December 21, 1999, Pierce International

---

1. Plaintiff has attached documents purporting to be irrevocable stock powers regarding the transfers, with supporting affidavits, to the Amended Complaint as Exhibits 1–5.

acquired all of the issued and outstanding stock of North American Software Corp. . During the acquisition, Pierce offered current shareholders the right to purchase additional stock at $0.25 per share. Plaintiff would have been able to purchase an additional 22,620 shares under this provision. By April 2000, the share price was $10.125 per share.

Plaintiff filed her complaint in this court on September 8, 2000. Defendants responded with a motion to dismiss, asserting that Plaintiff lacked standing to bring a claim because she was not a buyer or seller of the securities at issue. Plaintiff was directed by the court to produce the alleged irrevocable stock power supported by affidavit and file an Amended Complaint. Plaintiff filed a verified amended complaint on September 13, 2001, and attached documentary evidence, irrevocable stock powers and affidavits, in support of her claim that she was the owner of the securities at issue. Defendants responded with a renewed motion to dismiss.

## II. Analysis

### A. Standing under Section 10(b)(5)

■ Plaintiff's submission of an amended complaint, with evidentiary foundation, for her ownership of the stock suffices under Rule 12(b)(1). Although Defendants deny ever receiving copies of the documents, Plaintiff's showing is sufficient to survive the motion to dismiss.

### B. Private Right of Action for Mail Fraud and Wire Fraud

Defendants assert that Plaintiff's mail and wire fraud claims under 18 U.S.C. §§ 1341 and 1342 fail because there is no private right of action under these federal statutes. Plaintiff does not respond to these assertions in her opposition to Defendants' motion to dismiss.

The Supreme Court has held:

[t]he single most significant reason for the expansive use of civil RICO has been the presence in the statute, as predicate acts, of mail and wire fraud violations. Prior to RICO, no federal statute had expressly provided a private damages remedy based upon a violation of the mail or wire fraud statutes, which make it a federal crime to use the mail or wires in furtherance of a scheme to defraud. See 18 U.S.C. §§ 1341, 1343.

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 501, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Courts in this circuit have expressly held that "[n]o private right of action exists for 'mail fraud,' or for wire fraud." *Baker v. Data Dynamics, Inc.*, 561 F.Supp. 1161, 1166 (W.D.N.C.1983) (internal citations omitted). Therefore, Plaintiff has failed to state a claim for mail and wire fraud. Accordingly, Defendants' motion to dismiss pursuant to Rule 12(b)(6) will be granted as to Counts III and IX.

### C. Duty to Plaintiff

Defendants next assert that they owe no duty to a Plaintiff who is not their customer, stating that even if Plaintiff was the owner, Salomon Grey's only customer was Curtis B. Uhre, because the account was solely in his name. Plaintiff responds that Defendants had actual knowledge that (1) Plaintiff was the owner of the stock, (2) an implied contract existed between Defendants and Plaintiff, and (3) Defendants owed a fiduciary duty to her.

■ Plaintiff asserts throughout her complaint that her husband, Curtis B. Uhre, was acting as her agent in dealing with Salomon Grey and its representatives. Defendants respond that they owed Plaintiff no duty personally and cite *Linsey v.*

*E.F. Hutton & Co.,* 675 F.Supp. 1 (D.D.C. 1987), to support this assertion. That case, however, holds that the agent does not have standing to bring suit under the Securities and Exchange Act. Because Curtis Uhre is asserted to have been Plaintiff's agent, he would have no standing to bring a claim under § 10(b), according to the *Linsey* court. *See also Congregation of the Passion v. Kidder Peabody & Co.,* 800 F.2d 177, 181 (7th Cir.1986) (holding that whoever has the authority to make the investment decisions is the proper plaintiff under Rule 10b–5 and Section 10(b) and if a person retains their investment authority, they are the proper plaintiff); *O'Brien v. Continental Illinois Nat'l Bank and Trust Co.,* 593 F.2d 54, 60 (7th Cir.1979) ("Section 10(b)'s fundamental purpose is to assure that full information is available to decision makers in security transactions.") Therefore, as Plaintiff has alleged that she was the owner and decision-maker with regard to the securities in question, she is the proper plaintiff to bring a claim asserting breach of duty by Defendants. Accordingly, Defendants' motion to dismiss on the ground that they did not owe a duty to Plaintiff will be denied.

### D. Failure to State a Prima Facie Case against Rowe and Koupas

Defendants argue that Plaintiff's claims for violations of the Maryland Securities Act against Rowe and Koupas should be dismissed because Plaintiff has failed to plead facts demonstrating both control and culpable participation by the control person necessary to state a *prima facie* case. Plaintiff responds that Section 11–703 of the Securities Act does not require any allegation of control status or any specific requirement that Defendants were culpable participants in the alleged wrongful behavior.

There is no dispute that Maryland courts examine federal case law when interpreting state statutes that are worded similarly to their federal counterparts. *See Moseman v. VanLeer,* 263 F.3d 129, 133 (4th Cir.2001) ("Maryland courts examine federal case law when interpreting state securities statutes which, like section 11–703(h), are worded similarly to their federal counterparts"); *Baker, Watts & Co. v. Miles & Stockbridge,* 95 Md.App. 145, 620 A.2d 356, 369–70 (1993) ("In reaching our decision, we are aided by federal court interpretations of sections of the federal securities acts that are similar to § 11–703(c)"). Defendants state in their motion that they are "unaware of any Maryland case discussing the requirements of Section 11–703(c)." Paper No. 8, p. 7. However, *Baker Watts,* 620 A.2d at 370–71, does closely examine the terms "control" and "controlling person." In *Baker Watts,* 620 A.2d at 371, the Court of Special Appeals of Maryland noted that "[t]wo basic tests for control have developed in the federal circuits [and that] [b]ecause we decide that [the party] did not control ... based on the first prongs of the tests adopted by the federal circuit courts, we need not decide which entire test is applicable under the Maryland Securities Act, not do we adopt or endorse any particular test." The court observed "that the Securities and Exchange Commission has defined 'control' to mean:

> [T]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."

*Id.,* quoting 17 C.F.R. § 230.405 (1992). In addition, that court noted that some circuits have held that controlling person liability rests on "establish[ing] ... that the defendant ... 'actually participated in

(*i.e. exercised* control over) the operations of the corporation [the controlled person] in general . . . . '" *Id.*, quoting *Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985). Plaintiff has sufficiently alleged this first prong, making it necessary to examine the remainder of each test to determine whether Plaintiff has or can meet either or both.

One test, adopted by the third circuit holds "that secondary liability cannot be found under Section 20(a) unless it can be shown that the defendant was a culpable participant in the fraud." *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 890 (3rd Cir.1975). Other circuits, however, have expressly rejected the "culpable participation" test and adopted an alternative. In *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir.1990), the ninth circuit stated that "a plaintiff is *not* required to show 'culpable participation' to establish that a broker-dealer was a controlling person under § 20(a)" in the context of the broker-dealer/registered representative relationship. The ninth circuit "join[ed] several other circuits in holding that the defendant bears the burden of proving his good faith." *Id.* at n. 25. *See also Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1120 (5th Cir. 1980); *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.1980); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1170 (D.C.Cir.1978); *Fey v. Walston & Co., Inc.*, 493 F.2d 1036, 1051–52 (7th Cir. 1974); *Mader v. Armel*, 461 F.2d 1123, 1126 (6th Cir.1972). In those circuits, the burden is on the defendant "to prove his good faith." *Id.* Courts in the fourth circuit that have dealt with this issue are split. A judge in the District of Maryland has stated that "Plaintiffs must allege also that: . . . 2) that [the defendants], in some meaningful sense, were culpable participants in Cryomedical's alleged illegal activity." *In re Cryomedical Sciences, Inc.*

*Securities Litig.*, 884 F.Supp. 1001, 1011 (D.Md.1995). However, a judge in the Eastern District of Virginia recently decided to follow the circuits that hold that "Section 20(a) does not require a plaintiff to demonstrate culpable participation and instead provides the defendant an affirmative defense of 'good faith.'" *In re MicroStrategy, Inc. Securities Litig.*, 115 F.Supp.2d 620, 659 (E.D.Va.2000).

■ If Maryland adopts the third circuit's test, Plaintiff's complaint fails. On the other hand, if Maryland adopts the ninth circuit test, as have most circuits, the complaint proceeds. Eventually it may be necessary to decide which test Maryland will adopt. If at that time there is no further guidance from the Maryland courts, this court will consider certifying a question under the Maryland Uniform Certification of Questions of Law Act. MD. CODE ANN., CTS. & JUD. PROC. § 12–601–12–613 (1998). It is premature to do so now. Because the Maryland courts have not defined controlling person under § 11–703 of the Maryland Securities Act and the federal claims remain, this court declines to dismiss the pendent Maryland Securities Act claims against Rowe and Koupas for failure to state a *prima facie* case. Accordingly, Defendants' motion to dismiss for failure to state a claim against Rowe and Koupas will be denied.

### E. Cause of Action under Section 15(g)

Defendants move to dismiss Counts II and VIII, alleging violations of the Securities Exchange Act § 15(g) and Rules 15g–2 through 15g–6 and Rule 15g–9, for failure to state a claim because there is no recognized private cause of action for Section 15(g) violations. Plaintiff does not respond to Defendants' assertions.

■ Whether there is a cause of action under Section 15(g) "is, of course, one of statutory construction." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Therefore, the analysis must begin with the text of the statute itself. *Id.*

■ Section 15(g) reads, in relevant part, as follows:

No broker or dealer shall make use of the mails or any means or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any penny stock by any customer except in accordance with the requirements of this subsection and the rules and regulations prescribed under this subsection.

15 U.S.C. § 78o(g)(1) (1996). In simple terms, § 15(g) sets forth the requirements for transactions in penny stocks. It does not create a private right of action in favor of anyone. *Touche Ross & Co.,* 442 U.S. at 568–69, 99 S.Ct. 2479. "In ... cases finding implied private remedies, the statute in question at least prohibited certain conduct or created federal rights in favor of private parties." *Id.* at 569, 99 S.Ct. 2479. (internal citations omitted). Therefore, there is no private cause of action under Section 15(g) of the Securities and Exchange Act and its accompanying regulations. Accordingly, Defendants' motion to dismiss will be granted with respect to Counts II and VIII.

### F. "Failure to Secure Proper Signatures" Claims

Defendants move to dismiss Counts V and XI, alleging "Failure to Secure Proper Signatures" because there is no recognized private cause of action for this claim. Plaintiff does not respond to Defendants' assertions regarding these counts.

■ "In appraising the sufficiency of [a claim the court] follows, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The court is unable to locate a single case in Maryland or in the Fourth Circuit asserting a claim of failure to obtain proper signature. As Plaintiff has failed to provide any support for her allegation that such a claim even exists, she has failed to state a claim under 12(b)(6). Accordingly, Defendants' motion to dismiss Counts V and XI is granted.

### G. Request for attorney's fees and costs

Defendants request attorney's fees for defending against Plaintiff's claims. However, because some of Plaintiff's claims remain, awarding attorney's fees at this stage is not appropriate. Therefore, Defendants' request for award of attorney's fees will be denied.

### IV. Conclusion

For the reasons stated above, Defendants' motion to dismiss is granted in part and denied in part. A separate order will follow.

### ORDER

In accordance with the accompanying Memorandum Opinion, IT IS this _____ day of May, 2002, by the United States District Court for the District of Maryland, ORDERED that:

1. Defendants' Motion to Dismiss BE, and the same hereby IS, DENIED in part and GRANTED in part as follows:

A. Plaintiff's claims in Counts II, III, V, VIII, IX, and XI are dismissed without leave to amend;

B. Counts I, IV, VI, VII, X, XII, XIII, and XIV remain;

2. Defendants' Request for Attorney's Fees BE, and the same hereby IS, DE-NIED'

3. A separate scheduling Order will be entered; and

4. The clerk transmit copies of the Memorandum Opinion and this Order to counsel for the parties.